## CROMWELL v. REAM et al.

No. 25724. Sept. 17, 1935.

Rehearing Denied Dec. 10, 1935.

Application for Leave to File Second Petition for Rehearing Denied Dec. 24, 1935.

West & Davidson, Blakeney, Ambrister & Wallace, and P. J. Carey, for plaintiff in error.

Joseph C. Stone, Charles A. Moon, Francis Stewart, and A. J. Mauldin, for defendants in error.

PHELPS, J. On January 25, 1922, a contract was entered into between Elam E. Neal, S. S. Glasscock, Geo. E. Strauss, Allen L. Porter, and S. B. Hibbard, parties of the first part, and Joseph I. Cromwell, party of the second part, in which contract the parties, in effect, formed a partnership for the purpose of acquiring, developing, and selling oil and gas leases and royalties. All of the parties of the first part lived in or near Kansas City.

It appears that Geo. E. Strauss divided his interest in the partnership with Fred Strauss, and Glasscock divided his interest with G. F. Ream, and while neither Fred Strauss nor G. F. Ream signed the contract, they were mutually considered as having an interest in the partnership and they proceeded upon the basis that Elam H. Neal had a one-fifth interest, S. S. Glasscock and G. F. Ream had a one-fifth interest, Geo. E. Strauss and Fred Strauss had a one-fifth interest, and Allen L. Porter and S. B. Hibbard had a one-fifth interest, and Joseph I. Cromwell had a one-fifth interest.

In this contract parties of the first part agreed to procure and furnish necessary funds and credits to secure lands, leases, and

royalties and to pay all the expenses of acquiring and developing the same, and that Cromwell, the party of the second part, should have exclusive control of acquiring, developing, and disposing of the properties, and he was authorized to make contracts necessary to carry out the purposes of the partnership. Immediately following the execution of the contract, Cromwell set about securing, in Hughes and Seminole counties, acreage in which, in his judgment, there were oil possibilities, and for a part of this acreage thus secured he made a contract with Cosden & Company to drill a well, and in order to secure some other desirable acreage he contracted with the H. F. Wilcox Oil & Gas Company to drill an offset well to the Cosden well, providing the Cosden well was a producer, and for compensation for drilling this well the Wilcox people were to transfer to him certain acreage, this well to be started within 45 days after the completion of the Cosden well, provided the Cosden well was a producer.

It appears that Mr. Cromwell entered actively upon his duties as general manager of the company and Glasscock and Ream furnished him $4,200 and Strauss furnished $3,-000, making a total of $7,200 furnished for the enterprise, the other parties failing to furnish any money whatever.

Before the completion of the Cosden well lawsuits were filed attacking title to the property, and drilling operations were suspended, necessitating a delay, during which time the money paid in by the parties had been spent and debts accumulated and Glasscock and Ream, particularly Ream, who had paid in $2,400 of the money, became anxious about their investments, and a deal was made whereby Glasscock and Ream, on October 10, 1922, transferred, assigned, and relinquished to Cromwell all their interest in the partnership.

The Cosden well was completed as a producer and Cromwell drilled the offset well according to his contract with Wilcox. This well opened what is known in Oklahoma as the Cromwell pool in Seminole county and made the partnership properties very valuable.

On December 10, 1931, Ream, the defendant in error here, filed his suit against Cromwell in the district court of Muskogee county, in which he alleged fraud on the part of Cromwell in procuring the release, assignment, and transfer of Ream's interest in the partnership property and prayed for judg-

ment canceling, setting aside, and holding for naught said assignment and that he be adjudged to have an interest in the partnership property; that an accounting be had and that he have judgment for his interest therein and that the partnership be dissolved.

The case was tried to the court, resulting in judgment in favor of plaintiff and against defendant in the sum of $296,793.07, to reverse which this appeal is prosecuted.

Counsel for plaintiff in error in their brief present 34 assignments of error. As we view it, however, the vital issue in the case is whether the assignment bearing date of October 10, 1922, was a valid assignment of Ream's interest in the partnership and partnership properties, and if this question is answered in the affirmative, it is not necessary to consider the other assignments of error. The record in this case consists of approximately 2,000 pages, the briefs are necessarily voluminous, and in an effort to reach the proper conclusion we have not limited our research to the matters and things set out in the briefs, but have gone into the record with great care. In the first place it is necessary to determine whether the evidence was sufficient to impeach the document of October 10, 1922, executed by Ream and Glasscock, and upon this subject we have reached the conclusion that the judgment of the trial court was against the clear weight of the evidence; or, differently stated, that the plaintiff in the trial court failed beyond question to prove the fraud and concealment relied upon by him to cancel the written instrument.

Having reached this conclusion, it is not necessary to consider other questions presented, but for the purpose of the foundation for our conclusion a brief review of the facts as reflected by the record may prove helpful, particularly in view of the fact that the case has an unusual background and reflects the happening of some very unusual events.

It will be observed that this contract of partnership was entered into on January 25, 1922. It was terminated, in so far as Ream was concerned, by the transfer of his interest to Cromwell on October 10th of the same year. It is a matter of common knowledge that the discovery and development of the Cromwell pool marked an epoch in the petroleum industry in Oklahoma, and this suit was not commenced until December 10, 1931, more than nine years after the execu-

tion of the instrument sought to be set aside. Plaintiff in error pleaded the statute of limitation and laches, but in view of our conclusion herein it is not necessary to consider these defenses except in so far as they reflect the facts surrounding the entire transaction.

It was and is the contention of Cromwell that the contract of October 10, 1922, was entered into in good faith for a valuable consideration, and the inference is that, after the venture proved profitable to Cromwell almost beyond comprehension, Ream was disappointed in seeing a vast fortune slip away from him when it was almost at his fingers' tips, and that his feeling of disappointment and the advice of others (who sought to profit by the lawsuit was the motivating force prompting the litigation.

After the execution of the partnership agreement, Hibbard, Porter, and Neal failed to put any money into the enterprise, and Cromwell repaid to them certain moneys which they claimed they had been out for expenses, and also assumed all of their liabilities under the partnership and contracts executed on behalf of the partnership, and on May 6, 1922, they released, relinquished, and transferred, by a written instrument, their interest in the partnership to Cromwell. Hibbard and Porter later prosecuted as unsuccessful lawsuit against Cromwell for what they claimed to be an interest in, the partnership.

The record shows that several years after these events and after the development of the Cromwell pool, Mr. Cromwell had in his employ, as bookkeeper or secretary, a man by the name of A. W. Lawrence, and sometime during the year 1929, after he had been discharged by Cromwell, Lawrence went to Kansas City and interviewed Hibbard for the purpose of ascertaining the whereabouts of Neal and Ream. According to Hibbard's testimony, Lawrence made the statement that he had been in the employ of Cromwell, that he had much information concerning Cromwell's dealings, that he had contacted some lawyers in Oklahoma who could get some money from Cromwell for Neal and Ream if he could get them to bring suit against Cromwell.

Lawrence finally located and made a visit to Neal in Indiana and Ream in Ohio, shortly after which time suit was brought by Neal against Cromwell, claiming that he still had an interest in the partnership property.

Cromwell then discovered that the release, receipt, or transfer to him of the interest of Porter, Hibbard, and Neal in the partnership property of May, 1922, had disappeared from his files. He offered $1,000 reward for its return, but not being able to secure its return, he compromised and settled with Neal for a large sum of money, of which Lawrence testified he received $2,000 for his services in the lawsuit. This document showed up in the hands of Ream's attorneys at the trial of the instant case.

After Lawrence had visited Ream in Ohio (although he denied that the purpose of his visit was to interest Ream in bringing suit against Cromwell) correspondence was begun between Ream in Ohio and Hibbard in Kansas City, resulting in a contract between Hibbard and Ream, whereby Hibbard agreed to employ attorneys to prosecute Ream's claim against Cromwell and to pay the attorneys 50 per cent. of any amount that might be recovered by compromise or otherwise, 25 per cent. to be retained by Hibbard and the remaining 25 per cent. to go to Ream. Ream wrote Hibbard:

"I welcome any possible opportunity to get returns from the relationship entered into with J. I. Cromwell, and S. S. Glasscock and am returning signed, the agreement authorizing you to proceed, assuming all expenses in the case and giving me 25 per cent. of the recovered funds. * * *"

This contract bears date of December 7, 1929, and the instant case was not filed until December 10, 1931. One of the attorneys who represented Neal testified in the instant case that Hibbard told him that these attorneys would be employed to prosecute the Ream suit if they got results in the Neal claim. Lawrence also testified in the instant case for the plaintiff and stated that he expected to be paid for his services, for helping in the lawsuit, from the amount recovered from Cromwell. (It appears, however, that before the trial of the instant case the contract between Ream and Hibbard was canceled.) Both Glasscock and Hibbard intervened in this case claiming an interest in the alleged partnership property, but judgment went against them.

Cromwell's dealings with Ream were almost entirely through Glasscock—in fact, it appears that Glasscock was the one to interest Ream in the project, and with the exception of possibly one personal interview between them, at the suggestion of Glasscock, one letter written by Ream to Cromwell, and possibly one telephone conversation, Glasscock handled Ream's interest exclusively.

For recovery Ream depends upon fraud

and concealment on the part of Cromwell as to the condition of the partners and the partnership assets, and claims that he was deceived by Cromwell in the sale of certain properties belonging to the partnership, and that the money paid him or returned to him by Cromwell was money received from the sale of partnership leases.

It will be remembered that the sale of leases was one of the methods by which profits to the partners were to be made. It will be also remembered that it was the duty of Cromwell's partners to furnish the capital upon which to operate, and it was Cromwell's duty to manage the affairs of the partnership and he was authorized to make contracts for the partnership. In furtherance of his duty as manager, Cromwell obligated the partnership to drill the well which ultimately brought large production. Up to this time the partners had furnished but $7,200, and so far as we can glean from the record there was no concealment on Cromwell's part of his desire to sell a part of the partnership's assets to raise money with which to develop the partnership's holdings. On August 19, 1922, Cromwell wrote Glasscock inclosing plats showing the location of some of their leases and urging Glasscock and his associates to attempt to sell some of them. In this letter he called Glasscock's attention to a provision in their partnership contract that obligated the other partners to co-operate and not to expect Cromwell to do all the work and carry all of the expenses and divide the profits.

In reply to this letter Glasscock wrote Cromwell under date of August 21, 1922, as follows:

"Your plats received. I gave one of the plats to Ed Strauss. He is going to see what he can do with it. Rev. Ream has 1/5 I want to do something with it as he is very much upset about it. He has two thousand in it. I would like to dispose of for what he has in it. If you can do anything with it let me know what you can get for it." (It is admitted that the reference to Ream's interest is error and should have been 1/10 instead of 1/5.)

It will be observed that this letter was written on August 21st and the transfer of Ream's interest was not made until October 10, 1922. Ream also complains that Cromwell took the leases in his individual name, that he deposited the partnership funds to his own account, and that he did not keep a proper set of books. These facts within themselves, as we view it, constitute no evidence of fraud or concealment. It appears that at all times Cromwell was acting for the partnership rather than in his individual capacity, and for the purpose of carrying on the business of the partnership he personally obligated himself far beyond the contemplation of the partnership agreement. He did employ a bookkeeper, but there being no funds with which to pay the bookkeeper's salary, he resigned. Upon all occasions, when called upon, Cromwell made a full statement of the partnership's affairs. In Davis v. Howe, 99 Okla. 118, 226 P. 316, in the first and second paragraphs of the syllabus we said:

"Where fraud is charged, it becomes a question of fact and must be proved by the party alleging the fraud, and cannot be inferred from facts which may be consistent with honesty of purpose.

"Fraud is never presumed, but must be proved by clear and satisfactory evidence, and when a transaction is fairly susceptible of two constructions, the one which will free it from the imputation of fraud will be adopted."

The rule therein laid down is the settled law of this state, and this court will not uphold a finding of fraud unless it is supported by some evidence.

On September 5, 1922, Cromwell wrote to Strauss, advising that he had sent the plats to Glasscock and urging Strauss to co-operate. In the same letter he advised that the Cosden well had reached a depth of 2,140 feet and that because of attacks on title drilling operations would be suspended until the matter was investigated. In this letter he called Strauss's attention to the fact that he had paid out funds of his own and contracted obligations on behalf of the partnership and urged the partners to pay their part. Neither Glasscock nor Strauss sold any leases. On August 16th, Cromwell notified Glasscock that he had sold one lease for $3,000 and that he had offered another for sale for $4,000, and called Glasscock's attention to their contract to drill the offset and that they would have to raise the money to meet the expense by the sale of leases.

So far as the record shows, there was no claim on Cromwell's part that the $7,000 obtained from the sale of these two leases was anything except partnership funds, and the partnership contract provided that no profits should be distributed until a test well was drilled; therefore, there was no obligation on Cromwell's part to return to Ream any portion of his investment, and if Ream made a bad guess on the outcome of the venture

and accepted his $2,000 and transferred his interest in the partnership to Cromwell, the transaction must be viewed from the standpoint of the parties at the time the contract was made and not in the light of subsequent developments which proved profitable to Cromwell. In Twin Lick Oil Co. v. Marbury, 91 U. S. 587, the court said:

"The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands today is worth nothing tomorrow; and that which would today sell for a thousand dollars as its fair value, may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day."

After Porter and Hibbard had failed to pay any money into the partnership, and the partnership obligations were pressing, a meeting of the partners was called, and regarding this meeting Glasscock testified as follows:

"Q. What was the object of that meeting, of your coming down here? A. To make Porter and Hibbard put up money or get out. Q. Money for what? A. To run the business. Q. You had run out of money and the partnership was indebted and Porter and Hibbard hadn't put up any money. A. We had put up our money and they hadn't put up and if we were going ahead with the business they would have to put up some money. Q. Didn't you and Strauss refuse to put up any more money at that meeting? A. I don't think so. Porter and Hibbard hadn't put up any. I told them that if they didn't put up any money—we had, Mr. Ream and I had $4,200 up, and if they didn't put up any money, if Porter and Hibbard would give me $2,000 to give Mr. Ream I would get out and turn over the whole business. Q. Why do you say you agreed to give $2,000 to Mr. Ream when you say he put up $2,400? A. That $2,000, I was honor bound to get that and give it back to him, and if they were not going to do anything the things were in a bad shape and we had to have something done and I said if they would pay Mr. Ream I would give up all I had and get out."

Ream testified that he told Glasscock that he was beginning to be concerned about his $2,000 and asked what he could do to get it back, and that Glasscock told him that he saw but one way to get it back and that was to get Cromwell to buy him out, and Cromwell was willing to buy his 1/10 interest for $2,000, and that it looked to him like it would be necessary for Ream to lose the $400. In that conversation Glasscock told Ream that Cromwell had been advancing a lot of money for the partnership and that the outlook was not very promising, that Ream told Glasscock that he hated very much to give up his one chance, apparently, in life to make some money, but that if they held on a little while longer, it appeared that it would all be lost.

Apparently, as a result of this conversation with Glasscock, who at all times acted as the spokesman for and adviser of Ream, Ream decided to accept the $2,000.

At the risk of making this opinion too long, we think it advisable to incorporate some of the correspondence herein, as showing the facts leading up to the consummation of the transaction which nine years later Ream claimed was fraudulent. On August 23rd Cromwell wrote Glasscock as follows:

" * * * I wish to join you to relieve Rev. Ream of his present anxiety and as well make you feel easier and that you are protecting him. To this end, I suggest the solution; of buying the Strauss Bros.' part. As I understand they have $3,000 cash invested and hold 1/5 part. It occurred to me they would probably take their $3,000 cash and turn over their holdings. If you will see them and find if they will do this, I can finance it until we could realize this amount from some of the property, at which time I will agree to turn over one-half of their interest to you; in fact, you would own one-half of their 1/5 or another 1/10 of the whole, subject to the return to me of $1,500. By you and me owning this additional interest we could insure Rev. Ream against loss of any of his $2,000 and I will agree jointly with you that we be responsible to Ream against loss of his $2,000 in case we could not realize a profit for him out of the investment. * * *"

On September 2nd Glasscock wrote Cromwell as follows:

"I have talked with the Strauss boys. They want more money. They talk five thousand for their interest. I must do something for Ream. If you could sell his interest as I suggested if not as you suggested three thousand for the Strauss boys' interest I will turn mine over to you for that amount. I am going to Philadelphia and will be gone for ten days."

On September 4th before the contract was made on October 10th, Ream wrote Cromwell as follows:

"Last night Dr. Glasscock left for Philadelphia, and will be gone probably a week. As he left he told me he had written you stating that he was ready to dispose of his share in the oil prospect, or that portion

of his share in which my interest is included and that I might possibly hear from you while he was away. He has doubtless written you that I am exceedingly anxious to get back the money which I have invested, for the reason that I am being pressed by obligations which I cannot meet without it. When I made the investment a complete return seemed certain within a very short time else I could not have been at liberty to make it. Now that it has been somewhat prolonged I simply must get out. I sincerely regret to be compelled to turn my back upon the wonderful prospects which seem so absolutely certain of big returns for I should mightily enjoy a share in the big returns, but I'll have to resign in the favor of others who are more fortunate this time. I hope you will be able to turn the deal as quickly as possible for me so that I can have my $2,000 at an early date. Then when I can get on easy street again, if you have some other enterprise in which you can take a share I will be glad to do it. Very sincerely yours, G. Franklin Ream. P. S. If you send my share directly to me please fix up such receipt as will be satisfactory to yourself and the Doctor."

On September 19th Glasscock wrote Cromwell as follows:

"I have just returned. I do not believe I can do anything with the Strauss boys. I am very anxious to get Ream's money out and must do so regardless of the sacrifice I must make to do so. If you can help me I will appreciate it."

On October 4th Glasscock and Ream wrote a joint letter to Cromwell, reading as follows:

"In accord with the telephone message which Mr. Ream had with you Tuesday morning, we have gone over very carefully the whole matter of our oil interests. As he told you his personal situation is such that it is necessary for him at the earliest possible moment to turn his portion of the stock into cash. Our interest, as you know (Mr. Ream's and mine) is one-fifth of the total. We have decided to let you have one-half of our interest (which would be one-tenth of the whole) for $2,000. This is just the amount of capital Mr. Ream has had invested since last winter. He is sorry to be compelled to release his hold on this splendid prospect, but his situation makes it necessary. We hope you will be able to make this turn at once. Mr. Ream is asking to sign this letter with me so that you may know he understands and fully endorses it. He will be very anxious for an early reply. Very truly yours, S. S. Glasscock, G. Franklin Ream."

In reply to the above letter, on October 6th, Cromwell wrote Glasscock saying:

"* * * I have talked with two different parties lately about buying and they will not venture the investment at present, neither do they see the value of the property from our viewpoint. For me to purchase additional interest will greatly increase obligations that I am already bearing. Besides the $8,-300 I have invested in our deal for the same interest you and Strauss Brothers hold, I have advanced (here is an itemized statement) $2,285.94."

In this letter Cromwell goes ahead and tells of lawsuits pending against the property upon which the well was being drilled, and then says:

"With this situation unsettled, I would not even consider the Strauss Brothers offer you make of $2,000 for one-half of their interest. I am willing to do someway that would be fair to you and Mr. Ream and to myself to take over your interests, but do not believe the offer he and you submit to sell one-half of your interest for $2,000 quite meets the right basis. * * * To meet the present problem I am willing to purchase the one-fifth interest you and Mr. Ream hold in the leases and royalties by paying you $3,000 cash and release you from payment of your part of the amounts I have advanced, and we are jointly obligated to pay and release you from all further requirements or service under the two contracts we hold together. The canceling of your part of the amounts already incurred and stopping further expenses and rentals with the amount of cash I offer to pay approximates $4,000 for your one-fifth interest. * * * If you want to accept this proposal you may write or wire me, and I will immediately prepare and forward the releases and money required to complete the transaction."

On July 5, 1924, after the well had been brought in, Glasscock wrote Cromwell as follows:

"I saw your town paper today and was delighted to see of your success, you have made a hard fight of faith and are entitled to all you have made and more. You have had to deal with all the crooks and have dealt square with all men and women. While I am the loser in this deal I had to deal square with the preacher. I sold to you against your advice. If you had lost I would not have returned the money to you. You can see I have no regrets. The things I done to help you were acts of honor and deserve no recompense. Feeling that you will use your money to the glory of God and assuring I have known you intimately and still love you. I am most affectionately yours. (Signed) S. S. Glasscock."

It is therefore our conclusion that the judgment of the trial court was against the clear weight of the evidence, and the de-

fendant's demurrer to plaintiffs' evidence should have been sustained, and the judgment of the trial court is reversed and judgment here rendered for plaintiff in error.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BAYLESS, BUSBY, WELCH, and CORN, JJ., concur. GIBSON, J., disqualified, not participating.